IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

CARL H. JEANTY,

    Plaintiff,

v.      Case No.: GJH-13-1634

OFFICER S.E. HUSTLER, *et al.*,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

In this action, Plaintiff, Carl H. Jeanty ("Jeanty"), seeks damages for injuries he sustained when he was detained after officers of the United States Park Police ("Park Police") stopped his vehicle on the Baltimore-Washington Parkway ("BW Parkway") in response to a 911 call initiated by his son, Julian Jeanty ("Julian"). As a result of an earlier Court Order, *see* ECF No. 32, the only claims that remain in this case are a *Bivens*[1] action alleging violation of the Fourth Amendment to the United States Constitution against four Park Police officers, and an action under the Federal Tort Claims Act ("FTCA") alleging assault and battery against the United States of America (the "Government"). This Memorandum Opinion and accompanying Order address Defendants' Motion for Summary Judgment, ECF No. 52, for which a hearing is not necessary. *See* Loc. R. 105.6 (D. Md.). For the reasons stated below, Defendants' Motion is granted.

---

[1] *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S. Ct. 1999 (1971) (holding that individual federal agents may be held liable for damages based on constitutional violations that occur in the course of their work).

...

I. **BACKGROUND**[2]

Between 9:00 p.m. and 10:00 p.m. on September 6, 2011, Jeanty, a retired law enforcement officer for the United States Army, was driving southbound on the BW Parkway, obeying the speed limit. ECF No. 52-3 at 4, 10–11.[3] With him were his son, Julian, and his wife, Fatma Jeanty, and the three were headed toward the Greenbelt Metro Station, where Jeanty planned to drop off Julian so that he could take the Metro into Washington, D.C. *Id.* at 10. While en route, Julian—who suffers from bi-polar disorder and post-traumatic stress disorder—became angry when Jeanty refused to drive him directly to Washington, D.C. *Id.* at 5, 10. Julian then called 911, asking that officers "come quick" because his father "is talking about trying to flip the car and kill [Julian] and [his] mother." ECF No. 52-5 at 7; ECF No. 52-3 at 15; ECF No. 15-4 at 00:24–28.[4]

On the recording of the 911 call, Julian is heard describing the car as a "green Honda Civic" and indicating their location on the BW Parkway. ECF No. 15-4 at 00:06–00:16. The dispatcher on the other line is then heard directing officers to locate the vehicle. *Id.* at 00:40–00:55. The dispatcher describes the situation as "a rolling domestic." *Id.* at 01:12. Julian then says, "he is driving very fast, he is speeding up, sir, all of our lives are in danger here." *Id.* at 01:40–46. The dispatcher continues to question Julian, who explains that he is sitting in the back seat, and that his father is driving very fast and swerving the car. *Id.* at 01:54–02:10. Julian initially hesitates in giving the dispatcher his father's name, but after repeated questioning, Julian

---

[2] All facts are viewed in the light most favorable to the non-movant.

[3] All pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[4] Defendants provided the Court with a recording of the 911 call as an exhibit to their Motion to Dismiss, or, in the Alternative for Summary Judgment, *see* ECF No. 15-4, which the Court may consider in resolving the present motion. *See* Fed. R. Civ. P. 56(c)(3). Pin cites to the 911 call refer to the time signature on the recording in minutes and seconds.

2

obliges and identifies his father as Carl Jeanty. *Id.* at 02:10–57. Eventually, Julian indicates that he saw a police vehicle. *Id.* at 03:59–04:01. The dispatcher asks if there are any weapons in the car and Julian responds: "I don't know . . . he has guns at home . . . he has several weapons at home . . . he is off his psychiatric medication . . . he is acting very bizarre tonight." *Id.* at 04:16–39. The dispatcher then says that he is going to keep Julian on the line until the vehicle is stopped. *Id.* at 05:13–16.

Jeanty's recollection of the events that occurred after officers were dispatched in response to the 911 call differs widely from the responding officers' version of events. According to Jeanty, who was unaware of his son's call to 911, ECF No. 52-3 at 13, 15, he first realized something was potentially wrong after he noticed that, after passing a police cruiser that was parked in "standby mode" on the parkway, the cruiser followed his car "aggressively" for several minutes. *Id.* at 18. Jeanty, who recalls that it was raining heavily at the time, maintained his speed. *Id.* at 10–11. As he approached an exit, Jeanty saw a police cruiser coming toward him northbound on the parkway, which then cut across the lane, nearly causing a collision. *Id.* at 11, 16. Jeanty quickly stopped his car, which was then sandwiched between two police cruisers, and saw four individuals in uniforms, none of whom he recognized, come toward the car "shouting" and "hollering." *Id.* at 18–19. Jeanty turned off the car's engine, turned on his interior lights, and placed both of his hands on the roof. *Id.* at 18. Upon being instructed to exit the vehicle and hand over his keys, Jeanty immediately complied. *Id.* Jeanty stated that he was a retired federal agent and asked why he was stopped, to which he received no response. *Id.*

On the 911 call, which was still connected when Jeanty's car was initially stopped and while the officers approached the vehicle, Julian is heard shouting "help me out . . . I'm in trouble," and then repeatedly shouting "he's trying to kill everybody inside the car". ECF No.

15-4 at 05:51–06:09. Julian then says "step out of the car" multiple times. *Id.* at 06:15–25. At one point during the call, Julian says, "you should search him, yeah, he has several guns at home, he has several guns at home, I don't know if he has them on [him]." *Id.* at 06:33–44; *see also* ECF No. 52-3 at 30.

When he exited the vehicle, a "tall Caucasian officer," later identified as Officer Benjamin Tomasiello, ECF No. 52-4 at ¶ 3, brought Jeanty to the police cruiser parked behind Jeanty's car. ECF No. 52-3 at 26. While facing the police cruiser, Jeanty went to place his palms down onto the hood of the vehicle when he turned his head and neck about sixty degrees to talk to the officers to try to explain that there was no problem and that his son is disabled. *Id.* at 26, 28–29. According to Jeanty, Officer Tomasiello then "grabbed [him] behind [his] back and slammed [his] chest on the front hood of the vehicle" and then "grabbed [his left] hand . . . took it and twisted it to the point that [Jeanty] felt the top of [his] fingers touch the back of [his] head and [he] heard a popping sound from [his] shoulder." *Id.* at 26. Office Tomasiello also drove his knee into Jeanty's right thigh which caused "sharp pain" such that he almost passed out. *Id.* at 26, 35. Jeanty indicated that he was being hurt, but Officer Tomasiello nevertheless handcuffed him, searched his person, and removed his wallet from his pocket and examined its contents.[5] *Id.* at 26–27. No weapons were uncovered during the search. *See id.* at 27; ECF No. 52-7 at 9. While he was being searched, Jeanty again tried to tell the officers that nothing was going on and that his son is disabled, but another officer, later identified to be Officer Keith Johnson, ECF No. 52-4 at ¶ 1, told him to "shut up" and stated that, as a former police officer, Jeanty should "know not to say anything." ECF No. 52-3 at 27. During this time, Jeanty also observed an officer, later

---

[5] In other statements in the record, Jeanty indicated that, after examining the contents of his wallet, Officer Tomasiello "threw all of the items [in his wallet] onto the hood of the police vehicle." ECF No. 59-1 at 2; ECF No. 59-2 at 7.

identified as Officer Sarah Hustler,[6] at the right side of his vehicle "doing a cursory search" inside the vehicle with a flashlight. *Id.*

The fourth officer, whom Jeanty described as a "short Caucasian officer," and who was later identified to be Sergeant—now Lieutenant—Jeffrey Schneider, ECF No. 59-4 at ¶ 4, later approached Jeanty and stated, "I understand you are upset," to which Jeanty did not respond. ECF No. 52-3 at 34. Sergeant Schneider then instructed Officer Tomasiello to remove the handcuffs, and Officer Tomasiello stated, with a grin, "I'm sorry for roughing you up." *Id.*

Contrary to Jeanty's account, in her report of the incident, Officer Hustler indicated that Jeanty "was asked to step out of the vehicle several times and would not comply" with that order. ECF No. 59-3. Officer Tomasiello testified at his deposition that Jeanty was removed from the vehicle because, when responding to a domestic violence call, it is "common practice" to separate the parties while the officers investigate the situation. ECF No. 52-7 at 13. Officer Tomasiello recalled that, after he escorted Jeanty to the police cruiser and began a pat down search for weapons, Jeanty turned his head and body toward him approximately forty-five degrees despite being ordered not to move. *Id.* at 8, 12. In light of the circumstances, particularly that Julian had indicated that Jeanty needed to be searched for weapons, Officer Tomasiello testified that handcuffing Jeanty was necessary to ensure the safety of everyone at the scene in case he did, in fact, have a weapon in his possession or one was accessible in the vehicle. *Id.* at 12–13. Thus, Officer Tomasiello acknowledges, he "placed [Jeanty] on the hood of the car and put him in an arm bar and put him in handcuffs." *Id.* at 8. Officer Tomasiello confirmed that no weapons were found in Jeanty's possession and that Jeanty's wallet was removed from his person so that the officers could identify him. He denies, however, removing any items from

---

[6] The record indicates that Officer Hustler has since changed her last name to Cressman. *See* ECF No. 52-7 at 18; ECF No. 52-4 at ¶ 2. For ease of reference, the Court will refer to her as Officer Hustler.

Jeanty's wallet. *Id.* at 9, 12. With respect to his handcuffing technique, Officer Tomasiello recalled that he placed Jeanty's left arm "probably [on his] mid to the lower back," and he did not recall Jeanty ever indicating that he was hurt. *Id.* at 8–9. Officer Tomasiello further testified that the manner by which he placed Jeanty in handcuffs was consistent with his training, which required that, to handcuff an individual, an officer should "spread their feet apart, . . . take one hand or the other, whichever one [is] you[r] dominant hand . . . and you place it behind their back and place the handcuffs on." *Id.* at 5, 14. He did not recall saying anything to Jeanty after the handcuffs were removed, and, although he could not recall how long Jeanty remained in handcuffs, he did not believe that it was for longer than one hour. *Id.* at 9, 13.

The day after this incident, Jeanty went to Laurel Regional Hospital for treatment of his injuries. ECF No. 52-3 at 36. He received an x-ray, which was negative. *Id.* at 36–37; ECF No. 53. He later went to the National Naval Hospital, now called the Walter Reed National Military Medical Center ("Walter Reed"), for further treatment. ECF No. 52-3 at 36; ECF No. 53. At his initial visit at Walter Reed, Jeanty explained to doctors that his injuries were caused by an "assault" where, after his son had called in a false complaint to the police, officers "twisted his left arm behind his back and hit him with a knee in his [right] posterior thigh." ECF No. 53. The records further indicate that Jeanty had a pain level of four out of ten, which improved slightly with Motrin. *Id.* Jeanty was diagnosed with "joint pain, localized in the left shoulder: Suspect muscle strain in the poserior [sic] shoulder as well as mild contusion of his posterior thigh related to his incident." *Id.* He was referred to physical therapy and was prescribed pain and anti-inflammatory medicine, and was released without limitations. *Id.* At a later visit, Jeanty's medical records indicated that he also suffered from "muscle imbalance aggravated by recent[]

incident." ECF No. 54. Jeanty stopped physical therapy treatment after approximately four to five weeks. *See* ECF No. 54; ECF No. 52-3 at 41.

Jeanty later submitted an administrative claim for his injuries, but his claim was denied on December 5, 2012. ECF Nos. 15-2 & 15-5. Jeanty then filed the present action on June 5, 2013, listing the Government, "Office S.E. Hustler," and "Other As Yet Unidentified U.S. Park Police Officers" as Defendants. *See* ECF No. 1. The Complaint included six counts: (1) violation of the Fourth Amendment, (2) unlawful detention in violation of 42 U.S.C. § 1983, (3) deprivation of federally protected rights in violation of § 1983, (4) failure to train and supervise, (5) assault and battery, and (6) violation of the FTCA. *See id.* The Complaint did not indicate which counts were against the Government and which, if any, were against the officers individually.

On January 24, 2014, Defendants filed a Motion to Dismiss, or, in the Alternative for Summary Judgment, ECF No. 15, which the Court, after a hearing, granted, in part, and denied, in part, ECF No. 32. Specifically, the Court dismissed Count I against the United States, but reconstituted the claim as a *Bivens* action against the individual officers; dismissed Counts II and III for failure to state a claim under Fed. R. Civ. P. 12(b)(6); dismissed Count IV for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1); and dismissed Count V against the individual officers as barred by the FTCA, but permitted Count V to proceed against the Government under the FTCA. Finally, the Court merged Count VI with Count V, concluding that Count VI was merely a restatement of the claims in Count V. *Id.* Accordingly, the only claims that remain in the case are Count I, a *Bivens* claim against the individual officers for alleged violations of the Fourth Amendment, and Count V, a claim of assault and battery against

7

the Government under the FTCA. Defendants have filed a Motion for Summary Judgment seeking dismissal of both remaining claims, ECF No. 52, which Jeanty opposes, ECF No. 59.

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. FTCA Claim

Jeanty's claim against the Government arises under the FTCA, which confers jurisdiction on the district courts to hear claims "for . . . personal injury or death caused by the negligent or

wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant . . . ." 28 U.S.C. § 1346(b)(1). The FTCA thus serves as a waiver of the Government's sovereign immunity. *See Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005). This means, in effect, that the Government can be held liable for the intentional torts of certain government employees, including assault and battery. *See* 28 U.S.C. § 2680(h) (waiver of sovereign immunity applies to "acts or omissions of investigative or law enforcement officers of the United States Government, . . . arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution"). In this regard, courts apply the law of the state where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

In Maryland, "a law enforcement officer is not liable for assault and battery or other tortious conduct performed during the course of his official duties unless he acted with actual malice toward the plaintiff." *Goehring v. United States*, 870 F. Supp. 106, 108 (D. Md. 1994) (citing *Davis v. Muse*, 441 A.2d 1089, 1093 (Md. Ct. Spec. App. 1982)); *see also Littleton v. Swonger*, 502 F. App'x 271, 275 (4th Cir. 2012). "Actual malice," under Maryland law, is defined as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (internal quotation marks and citations omitted). "Malice is established by proof that the defendant-officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Rich v. United States*, 158 F. Supp. 2d 619, 629 (D. Md. 2001) (quoting *Lovelace v. Anderson*, 730 A.2d 774, 788 (Md. Ct. Spec. App. 1999), rev'd in part on other grounds, 785 A.2d 726 (Md. 2001)). "The mere assertion that an act 'was done maliciously, or without just

9

cause, or illegally, or with wanton disregard, or recklessly, or for improper motive' is not sufficient." *Manders v. Brown*, 643 A.2d 931, 943 (Md. Ct. Spec. App. 1994) (quoting *Elliott v. Kupferman*, 473 A.2d 960, 969 (Md. Ct. Spec. App. 1984)). Rather, a plaintiff "must allege with some clarity and precision those facts which make the act malicious." *Id.*

Jeanty argues that malice can be inferred from the extent of the force employed; in particular, that Officer Tomasiello's technique of handcuffing him was so violent that it caused Jeanty to seek medical attention the day after the incident. *See* ECF No. 59 at 4–7. Jeanty further argues that Defendants' contention that he was removed from the vehicle and handcuffed solely out of a concern for safety is pretextual because any exigent circumstances were resolved within a few minutes of the officers' arrival on the scene. *Id.* at 9–12. He opines that "[i]t is clear from the discussion on the recording [of the 911 call] that by the time . . . Jeanty's car was surrounded by the Park Police Officers, . . . Jeanty's son was displaying a calm demeanor and . . . there was no immediate risk to any occupants of the car." *Id.* at 10. At his deposition, Jeanty clarified that, with respect to the four officers, Jeanty alleges that only Officer Tomasiello used excessive physical force against him, and that any such excessive force occurred only during the handcuffing process. ECF No. 52-3 at 30–31.

It is undisputed that, when they stopped Jeanty's vehicle, the officers were acting in response to a purported "rolling domestic" dispute, and that their response was initiated by a 911 call made by Jeanty's son, Julian. *See* ECF No. 15-4. On the call, Julian told the 911 dispatcher that his father was "talking about trying to flip the car and kill [Julian] and [his] mother"; *id.* at 00:24–28; that Jeanty was "driving very fast," and "speeding up"; *id.* at 01:40–46; and that Julian did not know whether Jeanty had any guns in the car but that "he has several weapons at home" and "he is off his psychiatric medication." *Id.* at 04:16–39. Julian further urged the dispatcher to

send officers quickly, saying "all of our lives are in danger here."[7] *Id.* at 01:40–46. It is further undisputed that once the officers arrived on the scene, Julian shouted "Hey, help me out man! I'm in trouble!"; "he's trying to kill everybody inside the car"; and, finally, "you should search him, yeah, he has several guns at home, he has several guns at home, I don't know if he has them on [him]." *Id.* at 05:51–06:09, 06:33–44; *see also* ECF No. 52-3 at 30. Under these circumstances, it was reasonable for the officers to order Jeanty to exit his vehicle and to search him for weapons. *See, e.g., United States v. Walker*, 46 F. App'x 701, 701–02 (4th Cir. 2002) ("Police officers may order individuals out of a vehicle during a traffic stop and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous." (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330 (1977)); *Leftridge v. Matthews*, No. CIV.A. ELH-11-3499, 2013 WL 5467724, at *16 (D. Md. Sept. 30, 2013), aff'd sub nom., *Leftridge v. Doe*, 565 F. App'x 231 (4th Cir. 2014) ("[I]f an officer conducting an investigatory stop has reasonable fear for his own or others' safety, the officer may conduct a *Terry* frisk: a reasonable search for weapons for the protection of the police officer, where [the officer] has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (internal quotation marks and citations omitted)).

Further, by Jeanty's own account, after he was escorted to the police cruiser and while he was placing his hands on the hood of the cruiser in order to be searched, he turned his head and neck about sixty degrees so that he could try to explain the situation to the officers. ECF No. 52-3 at 26, 28–29. He did so in spite of Officer Tomasiello's order that Jeanty not move while he

---

[7] For this reason, the Court again rejects Jeanty's argument that he was illegally seized. *See* ECF No. 59 at 9. The Court already rejected this claim at the motion to dismiss phase, noting that, in light of the 911 call, the initial stop of Jeanty's vehicle was reasonable, even if the force later used was excessive.

conducted the search.[8] ECF No. 52-7 at 12. In light of the information provided to the officers by Julian regarding the present danger being created by Jeanty, the only reasonable inference to be drawn from this evidence is that, while Officer Tomasiello may have acted aggressively in pulling Jeanty's arm so forcefully that his hand touched the back of his head and in driving his knee into Jeanty's thigh, he was nevertheless motivated by a desire to ensure the safety of himself, Jeanty, and the other individuals on the scene during a tense, rapidly evolving situation, rather than any ill will toward Jeanty.[9] Thus, summary judgment will be entered in favor of the Government on Jeanty's FTCA claim.

### B. *Bivens* Claim

Having determined that the Government is entitled to summary judgment under the FTCA, the Court is obligated to apply the judgment bar provision of the FTCA, which provides: "The judgment in an action under [the FTCA] shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. Thus, because the Court is granting summary judgment in favor of the Government on Jeanty's FTCA claim, his *Bivens* claim against the individual officers must also be dismissed. *See Unus v. Kane*, 565 F.3d 103, 122 (4th Cir. 2009) (holding that FTCA judgment bar precludes a *Bivens* claim "when a judgment has

---

[8] Jeanty does not say whether he was told not to move, but he does acknowledge that he is aware, from his experience as a police officer, that when an officer tries to place handcuffs on a person, "that person is not free to move until" the officer tells the person he can move. ECF No. 52-3 at 6. When the Court considered this issue when ruling on Defendants' Motion to Dismiss, or, in the Alternative for Summary Judgment, ECF No. 15, the Court concluded that discovery may help resolve whether the amount of force used was excessive in light of Jeanty's allegation that he was cooperating fully with the Park Police Officers' orders when he was handcuffed. Jeanty's admission during his deposition that he turned his head and neck to try to speak with the officers during the pat-down lends additional support to the arguments of the Defendants.

[9] Notably, the law gives officers some leeway in determining the amount of force necessary under such circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (internal quotation marks and citation omitted)).

12

been entered on a FTCA claim 'arising out of the same actions, transactions, or occurrences' as the *Bivens* claim." (quoting *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 858 (10th Cir. 2005))); *see also Cash v. United States*, No. CIV. WDQ-12-0563, 2012 WL 6201123, at *9 (D. Md. Dec. 11, 2012) ("*Unus* is clear: if there is a judgment for the United States on the FTCA actions, the related *Bivens* actions must be dismissed.").

In his opposition to Defendants' Motion for Summary Judgment, Jeanty fails to mention the applicability of the FTCA judgment bar. Jeanty appears to argue, however, that his *Bivens* action against the individual officers can proceed notwithstanding the judgment bar because his claim is not limited to allegations of excessive use of force, *i.e.*, assault and battery, but rather also encompasses an allegation that the officers illegally searched his vehicle and his "personal effects." ECF No. 59 at 9. In other words, Jeanty seems to suggest that at least certain allegations under his *Bivens* claim do not arise under the "same subject matter" as his FTCA claim. Although this is a strained argument at best,[10] even assuming that Jeanty's illegal search claim could proceed notwithstanding the FTCA judgment bar, Defendants would still be entitled to summary judgment on this count.

In order to succeed on a *Bivens* claim, a plaintiff must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937 (2009). In other words, a plaintiff must allege each defendant's personal participation in the alleged constitutional violations. *See Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014). Here, Jeanty alleges that Officer Tomasiello was responsible for the search of his wallet, while Officer Hustler searched his vehicle. ECF No.

---

[10] *See Unus*, 565 F.3d at 122 ("In order for § 2676 to have effect, it must encompass all of the claims that could have been brought with regard to the conduct at issue against the responsible 'employee of the government.'").

52-3 at 27 (indicating that the "tall Caucasian police officer" removed the contents of his wallet and the "female Caucasian officer" conducted a "cursory search" of the vehicle).

Any claim against Officer Tomasiello cannot proceed, however, because Jeanty never named Officer Tomasiello in the Complaint and, not only has the deadline to amend the complaint under the Court's scheduling order expired, *see* ECF No. 42, but so, too, has the statute of limitations.[11] *See Samuel v. Palmer*, No. CIV. PJM 09-3141, 2010 WL 2976133, at *2 (D. Md. July 22, 2010) ("As *Bivens* actions do not have an express limit period, claims filed pursuant to *Bivens* are subject to the analogous state statute of limitations."); *Arawole v. Gaye*, No. CIV.A. PJM-02-167, 2002 WL 32356684, at *1 (D. Md. Feb. 5, 2002), aff'd, 46 F. App'x 206 (4th Cir. 2002) ("The statute of limitations for *Bivens* actions arising in Maryland is three years." (citation omitted)). Although Jeanty has not moved to amend the Complaint to add Officer Tomasiello as a party, even assuming he had done so, amendment would not be permitted because it would be futile. *See Elrod v. Busch Entm't Corp.*, 479 F. App'x 550, 551 (4th Cir. 2012) ("A trial court is permitted to deny leave to amend a complaint if the proposed amendment would be futile. An amendment would be futile if the complaint, as amended, would not withstand a motion to dismiss." (citation omitted)).

Rule 15(c) of the Federal Rules of Civil Procedure allows an amended pleading to "relate back" to the date of the original pleading if (1) the amendment asserts a claim that arose out of the same conduct, transaction, or occurrence set out in the original pleading, and (2) "the party to be added (a) received timely notice of the action such that he would not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that he would have been named as defendant 'but for a mistake concerning the proper party's identity.'" *Tatum v.*

---

[11] This conclusion applies with equal force to the other officers there were not named in the Complaint, Officer Johnson and Sergeant Schneider.

*RJR Pension Inv. Comm.*, 761 F.3d 346, 371 (4th Cir. 2014), cert. denied, 135 S. Ct. 2887 (2015) (quoting Fed. R. Civ. P. 15(c)(1)(C)(ii)). Jeanty cannot satisfy the "mistake" requirement of Rule 15(c)(1)(C)(ii) because "lack of knowledge of the true identity of a party does not qualify as a 'mistake' as that term is interpreted by a majority of circuits, including the Fourth." *Barnes v. Prince George's Cty., MD*, 214 F.R.D. 379, 381 (D. Md. 2003); *see also Western Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1201 (4th Cir. 1989) (noting that Rule 15(c) "does not permit relation back where . . . there is a lack of knowledge of the proper party"). Additionally, there is no basis upon which the Court could find that Officer Tomasiello received notice within the applicable time limit.[12] Thus, because Jeanty cannot maintain an action against a defendant when that claim is time-barred and the claim does not relate-back, any allegations against Officer Tomasiello must fail.

Jeanty fares no better on his allegation that Officer Hustler violated his rights under the Fourth Amendment when she conducted a "cursory search" of his vehicle because she is entitled to qualified immunity with respect to this claim. "To survive summary judgment on qualified immunity grounds, a constitutional tort claim against a federal law enforcement official must rest on a violation not only of currently applicable federal law, but also of federal law that was 'clearly established' at the time the alleged conduct occurred." *Lyles v. Sparks*, 79 F.3d 372, 378–79 (4th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). "In any qualified immunity analysis, [the Court] must first ask whether an officer

---

[12] In his response in opposition to Defendants' Motion for Summary Judgment, Jeanty argues that he had identified the "Other as Yet Unidentified U.S. Park Police Officers" at least as of June 4, 2015, when they each were deposed. ECF No. 59 at 13. Notably, however, as of June 4, 2015, the deadline to provide "timely notice" pursuant to Rule 15(c)(1)(C) had already expired. *See* Fed. R. Civ. P. 15(c)(1)(C) (allowing relation back "if, *within the period provided by Rule 4(m) for serving the summons and complaint*, the party to be brought in by amendment . . . received such notice of the action that it will not be prejudiced in defending on the merits") (emphasis added). Furthermore, although Jeanty argues that "[i]t would be incongruous for the Plaintiff to be required to amend the Complaint prior to the close of discovery," ECF No. 59 at 13, it is common practice for this Court to require amendment of pleadings to join additional parties several months before the close of discovery.

violated a constitutional right at all. If [s]he did not violate any right, [s]he is hardly in need of any immunity and the analysis ends right then and there." *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)). "Next, assuming that the violation of the right is established, [the Court] must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that [her] conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier*, 533 U.S. at 201–02).

Certainly, law enforcement officers are not permitted to "conduct automobile searches *whenever* they conduct an investigative stop" of a vehicle. *Michigan v. Long*, 463 U.S. 1032, 1050 n.14, 103 S. Ct. 3469 (1983) (emphasis in original). An officer is permitted, however, to conduct a "protective search of the passenger compartment of a lawfully stopped automobile where the 'officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that [a] suspect is dangerous and the suspect may gain immediate control of weapons' within the vehicle." *United States v. Holmes*, 376 F.3d 270, 276 (4th Cir. 2004) (emphasis omitted) (quoting *Long*, 463 U.S. 1032, 1049–50; *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968)). Moreover, in the context of a brief detention, such as the one that occurred in this case, the United States Court of Appeals for the Fourth Circuit has recognized that "a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007); *see also United States v. Griffin*, 589 F.3d 148, 154 n.8 (4th Cir. 2009) (noting that a protective search of a

16

vehicle is permitted during a *Terry* stop[13] because "the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed" (quoting *Arizona v. Gant*, 556 U.S. 332, 352, 129 S. Ct. 1710 (2009) (Scalia, J., concurring))).

On the 911 call, in response to the question of whether there were any weapons in the car, Julian responds: "I don't know . . . he has guns at home . . . he has several weapons at home . . . he is off his psychiatric medication." ECF No. 15-4 at 04:16–39. Additionally, after the officers stopped Jeanty's vehicle, Julian is heard saying to them: "you should search him, yeah, he has several guns at home, he has several guns at home, I don't know if he has them on [him]." *Id.* at 06:33–44. These statements, considered in light of Julian's earlier statements that Jeanty was "trying to kill everybody in the car," *id.* at 05:53–06:09, amounted to a reasonable suspicion that Jeanty may have been armed and dangerous and that a protective search of the car was necessary to ensure the safety of the officers on the scene, the other individuals in the car, and of Jeanty himself. *See* ECF No. 52-7 at 10 (indicating that Officer Tomasiello determined that it was necessary to detain and search Jeanty under "the totality of the circumstances" where "somebody in the vehicle [was] yelling somebody needs to be search[ed] and has weapons"). Because there was no constitutional violation, Officer Hustler is entitled to qualified immunity with respect to this claim.

For these reasons, even assuming the judgment bar did not already foreclose Jeanty's *Bivens* claim, Defendants would nonetheless be entitled to summary judgment on this count.

---

[13] *See Terry v. Ohio*, 392 U.S. at 27 (holding that a police officer has authority to conduct "a reasonable search for weapons . . . where he has reason to believe [based on an articulable suspicion] that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime"); *see also Long*, 463 U.S. at 1049 (holding that, during a *Terry* stop, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons" (internal quotation marks and citation omitted)).

## IV. CONCLUSION

For the reasons discussed, Defendants' Motion for Summary Judgment is **GRANTED**. Jeanty's Complaint is therefore dismissed with prejudice. A separate Order follows.

Dated: January 19, 2016

GEORGE J. HAZEL
United States District Judge